Case number 18-3139, Marsha Prisbys v. City of Toledo et al. Oral argument is not to exceed 15 minutes per side. Mr. Richardson for the appellant. Good morning. Shelley, morning again. Yes. Thank you to the court for giving us this opportunity to present our argument regarding state-created danger, as I understand that's the court-specific inquiry. I first would like to address what I believe are three of the most pertinent cases, and I'll follow with what I believe is a summary of the evidence that was presented in the motions for summary judgment that we believe should have been a basis for denying the defendant's motion for summary judgment, and then just some concluding remarks. I'd like to begin our presentation to the court focusing on the Sumar, the Kallstrom, and the Nelson case, and I believe the Sumar case, though on its face would appear to be a very unfriendly case to a plaintiff, we believe it establishes a clear distinction with a state-created danger that the court should take into consideration. Specifically in Sumar, it, too, involved a confidential informant, an informant who, based on the previous arguments of the defendant, and I believe the district court, is a status that one enters into voluntarily. But with that voluntary submission, I believe it requires for the court to determine a baseline risk level that that person is subjected to. Without a baseline risk, it's impossible or very difficult to determine whether the government has created, or more importantly, increased the risk to the plaintiff from violence by a private party. Specifically in Sumar, the informant... Counsel, this is Judge Sutton. We're still going to have questions, so if you hear our voice, it's usually a good idea just to stop and hear what we have to say. So one thing that I think would be helpful for you to focus on is, instead of perhaps summarizing the cases, what cases are there in which the claimant won, in other words, someone in your position, where they didn't name the confidential informant? I mean, did that happen? Well, I believe that... Is that the completion of your question, Your Honor? Yes. Okay. I guess specifically, I don't know that there is a case, with the exception of Kallstrom, that has found an increase or a creation of a risk, albeit with a privacy, a constitutionally protected privacy interest. But if I could just finish with... In a Sumar case, the informant agreed from the very beginning that he would be risking disclosure of his identity by agreeing to conditions of the informant. Counsel, that's why I phrased the question the way I did. I wanted to focus on cases in which your side won. It's very hard to establish a holding, which is what we're focused on in qualified immunity, helpful to your side if the claimant lost the case. Does that make sense? It makes sense. I just believe that... Can you hear me okay? Yeah, I'm here. Yeah. Okay. It sounded like the phone cut out. Well, I guess the victorious plaintiff was in Kallstrom, who prevailed on a constitutionally protected privacy interest because, as a group, these undercover police officers established that their risk position changed as a result of state actions in disclosing their personal information in the course of discovery. Now, I apologize for coming back to it, but the baseline risk that Tom Schivitz assumed by becoming an informant did not include disclosing his identity, which is the difference between him and the plaintiff in Sumar. Our position is that the manner and the means in which this by-bust occurred was the equivalent of telling Scott Warnka who ratted him out. It was done in such a reckless manner, and it was done at his place of employment. It was done through an undercover that Mr. Schivitz had introduced to Mr. Warnka, that the arrest was made immediately, which is a choice, an affirmative choice that is unheard of in making undercover busts. And they did this with such a show of force that it was immediately clear to Scott Warnka who had set him up, which makes the case, in our estimation, the equivalent of Nelson with nonverbal communication. The by-bust itself was the communication, and it was done in such a way that it undeniably revealed Tom Schivitz as the informant. And it all played out exactly consistent with what happened. So we believe that the government increased at a minimum the risk to Tom Schivitz when they conducted this by-bust in the way they did. It distinguishes it significantly from Sumar, who assumed a baseline risk of disclosure from the very beginning. The only evidence in the record confirms that Tom Schivitz did not expect and did not agree to have his identity revealed when he texted Carrie Williams, what's going on, I thought we were keeping my name out of this. And that was in his first communications to Carrie Williams that things had gone south, that things had gone bad. So Telstrom prevailed. Can you help me with the point that this happens at the place of work? Is that where the drug sale occurred? Both buys occurred at Tom Schivitz's place of employment. Right. So the point I'm getting at is it just seems to me question-begging how much that revealed. I mean, if you do the drug sales at the place of employment, why isn't it a surprise that the arrest is going to be at the place of employment? And why is it so unusual to do drug sales at your place of employment? That's where you are. It's convenient. Well, I would submit to the court that obviously his place of employment is an identifying factor, Tom Schivitz being involved. But more importantly, we believe, is the fact that they immediately made the arrest. They did nothing to create any space between that identifying location of Tom Schivitz and the buy bus, which went down right in the parking lot. It is commonplace that that arrest is made some period of time later or is made the basis of filing a charge with a warrant. It's the only means of protecting the informant. When you bust him right in his backyard with an undercover agent. Counsel, this is Judge Ziriner. What would the scenario be if your client was not a confidential informant but they had the defendant under surveillance and they arrested immediately as they saw or observed a sale? Your client would have been picked up immediately and then. So are you saying he would have been totally in danger at that time if he was not a confidential informant? If they made the arrest the same way? Well, if your question, Your Honor, is if this sale of drugs had occurred just as it did but did not involve Tom Schivitz as the informant, that it had just happened through some other means. Well, I guess my answer would be if he's not involved, then there's no risk to him. Why wouldn't there be? According to you, it's the immediacy of the arrest that puts the onus on your client. But I've given you a scenario where that's not true or you've said it's not true. Well, I think the link is that Mr. Schivitz was used as the means of introducing the undercover officer who made the buy to Mr. Warnka. So the undercover officer created the link between Mr. Warnka and Mr. Schivitz that allowed Mr. Warnka to immediately conclude that he'd been set up. Was the arrest done in Mr. Schivitz's car? It was in the parking lot but not in his car. And present also at the scene were Mr. Warnka's girlfriend and a drug dealer who immediately, on behalf of Mr. Warnka, started the threatening calls to Mr. Schivitz. They were present when the arrest occurred and they all knew because they started calling Tom Schivitz while Mr. Warnka was in jail waiting to bond out. So there was no effort made to protect the identity of Tom Schivitz whatsoever at that scene. It sounds like you've gone about 10 minutes. We'll give you your full five and we'll hear from the other side. Continue now? We're going to hear from the city of Toledo and you'll get your full five minutes of rebuttal, Mr. Richardson. Thank you, Your Honor. Thank you. May it please the court, Jeff Charles here today on behalf of the municipal defendants, the city of Toledo, and in particular, Officer Sergeant Kerry Williams. It's our position that the trial court correctly granted summary judgment and found that she was entitled to qualified immunity due to the fact that there was no state-created danger. It's our position, Your Honor, that there was no constitutional bright line that existed at that moment in time. There was no case law that informed her that by conducting the operation as she did or responding to the phone call as she did that that act was a violation of his 14th Amendment due process rights. But what's your response? This is Judge Sutton. What's your response to the appellant's, I guess his main reliance is on Sumar. What's your response to that case? Well, I note that the trial court noted that Sumar, there's a note, too, on I think it's page 1092 that indicates, although it is a special relationship case, notes that an individual's decision to become an informant is what puts them at risk, and I don't believe there's any case law that indicates that an individual's decision to become an informant supports a state-created danger cause of action. And I don't think that, for example, the timing of the buy or the use of the word copacetic or anything related to the buy-bust that occurred or any of those things implicate the 14th Amendment of the U.S. Constitution. I think if the court correctly applied a saucier versus Katz analysis and found that at that time what she did was not violative of the U.S. Constitution, therefore there's no, she's entitled to qualified immunity. Let me ask you this. Yes, Your Honor. Charles, this is Ron Gilman. How do you respond to the plaintiff's expert witness, Michael Lyman, who opines that it was a violation, that what Officer Williams knew or should have known, that she would be readily identifying, you know, and Warnka in his deposition says, oh, it was obvious who the informant was, and you've got this expert witness who's got an opinion, and how do we, therefore, rule on summary judgment on that? Well, it's been my experience, Your Honor, that experts make a common mistake, and this one's made it as well, of providing legal conclusions that are not supported. You know, most of his testimony was improper, and there was a motion limiting the file. As to my expert, and the court I'm sure noted that all of his conclusions, Lyman's conclusions, are not supported by anything in the record. I suppose it would be different if someone could opine and state that every police department in this part of the state of Ohio does it a certain way and we didn't do it that way, but that's not what happens. Plus, there's case law out there that says the violation of a manual or of an aspirational guideline, which was the sole basis of the expert's opinion, was his complete reliance on an aspirational guideline. That does not form the basis of a constitutional tort either. And certainly there's no, the fact that Mr. Warnka sells cocaine out of a factory, and the fact that he gets arrested by us doesn't implicate the U.S. Constitution. We're allowed to arrest people when they do such things. Right. The question is whether you created a special, you know, the state created danger to the confidential informant, though, by the manner in which you conducted the arrest there. Well, I found no case law that says the timing of an arrest supports a state-created cause of action. What supports a state-created cause of action is when an actor affirmatively does something that puts them at risk. It's an individual liability statute. There's no evidence that's ever been put forward that says Officer Williams ever revealed his identity. In fact, she went to some length to protect his identity. You know, she, it was an undercover operation. He was never going to testify. If anybody ever did, it would have been Mel Citura. And she, no one knew of Shibish's existence other than Sergeant Williams. And I just, I don't see anything, she did nothing. I mean, if you look at the cases that plaintiff relies upon, they're all very clear. I don't care which one it is, Kallstrom, Sumar, or whatnot. They all involve a very specific affirmative act. The guy, the friend of the murderer, oh, by the way, you were informed upon by so-and-so for no reason whatsoever other than he did it. That just didn't happen here. I believe that's the main difference. To continue, I do think, again, I'd just like to emphasize that I feel that there was no, there was nothing advising Officer Williams at the time that, you know, her conduct relative to anything she did violated his due process rights. I think the case, you know, Burley v. Gagecki is important. You know, it talks about the fact that, you know, it's a plaintiff's burden to show she violated a constitutional right in that she knew she was doing so and there's a clear line of cases. And I think the very fact that we're here today discussing footnotes and Sumar and related matters indicates that there clearly was no bright light. And, therefore, it's our position, I think, that the trial court correctly granted summary judgment and found that she was entirely qualified. I mean, I think there's a great gulf between the cases plaintiffs relies upon and the acts, if you will, of Sergeant Williams, which largely consisted of protecting him. Well, you know, what do you make of Wonka's testimony that he said, well, it was obvious who set me up? Well, the fact that he can figure out he was arrested doesn't mean that, you know, we've created that danger. I mean, I suppose any time somebody gets arrested, they think they were informed upon. The standard, though, is whether or not she affirmatively put him in danger. I mean, if we start assigning liability to police officers because, you know, the manner in which a drug buy went down, then certainly I don't think we'll do undercover drug buys anymore. Well, you don't always arrest them on the spot, do you? Well, sometimes we do, sometimes we don't. Well, you're talking about your friend. It depends. He was going to leave town. We decided to arrest him. There's no constitutional requirement that we plan a drug raid in a certain manner. Well, no, I guess. But you just can't do it if it, in fact, would put this person at special risk. Well, I don't know what that analysis would be. And, again, I think the standard helps us there because the standard says, well, if you plan the drug raid in a manner that, you know, affirmatively puts them at risk, knowingly doing so, then perhaps that's the case. But there's no case law that comes close to saying that, you know, the timing of the arrest implicates the due process clause of the 14th Amendment. Now, I guess, are you familiar with a case of ours called McQueen v. Beecher Community Schools? It's a 2006 decision. Well, was that the one where the kid got shot in the classroom, Your Honor? I think so, yes. I mean, it talks about calstrum. Yes, I do. I think I used it in my brief. But I think if I remember right, did the school know that the kid was dangerous? I don't remember the facts. There's one sentence in there that I just wanted to get your comment on. I mean, it talks about, you know, the standard of calstrum, about whether the state knew or should have known of the actions was specifically in danger of the individual. And then it goes on to say that that's equivalent to deliberate indifference, and deliberate indifference is equivalent to subjective recklessness. And then it says subjective recklessness can, quote, be proven circumstantially by evidence showing that the risk was so obvious that the official had to have known about it. And so I think maybe that drills down to the key here is that so, you know, was the conduct so obvious here that the official, that would be Williams in this case, should have known about it. What's your response to that? Well, I think in Williams' operation, McQueen, I think ultimately, I may be wrong, but I thought that they fought against the plaintiff, I think, if I remember right, even though I don't think they prevailed in that case. But, no, I don't think subjective recklessness is the standard that's applicable here. I mean, I don't think when the buys occurred or the manner in which they occurred would have put Officer Williams on notice that she may be violating his constitutional rights. I think it creates an impossible standard. This is a routine event. This case is unusual for a lot of different reasons, but I think it's also maybe important to mention the fact that everybody was shocked and amazed that he got murdered. I mean, it was an F-5. He bonded out right away. They were friends. The McQueen case, God, I wish I – you know, I remember that. I know there was much more information available, I believe, to this teacher that would have put them on notice. You know, let me ask you this. Once Chivitz got calls, threatening calls, he notified Williams of that. Did she have any obligation to protect him? No, I don't believe so, because then we're going to talk to Cheney v. Winnebago. I mean, she's being informed of a potential private act of violence. The police are routinely informed of those type of events, and I don't have an affirmative duty to stop it from happening. You know, he decided to become an informant. He chose to do that line of work. He was a willing and eager informant. No, I think it's – I don't have a duty to protect him from a private act of violence. There's a case law that says even if I know it's coming, I don't have an affirmative duty to stop it. Right. So the key may be, do you have an affirmative action not to start it? In other words, and that gets down to, was the manner of the arrest at the place of his employment. Yeah, but I've always thought that the tenuous connection, a tenuous proximate cause trail, because you have to, you know, assume that, you know, when the arrest took place and the timing of the arrest also are leading to, you know, knowledge that, you know, somehow Warnka, who was a friend with Shibbert, she was going to kill him. I mean, it becomes too attenuated to, you know, survive even a Paul's graph test. The court doesn't want – doesn't need any more questions or doesn't want to – again, we rest at this point just indicating again that it's our position that she was entitled to qualified immunity due to the fact that at the point in time there was no bright line line of cases that would have apprised her that either not doing something more, you know, when she received the phone call or planning the arrest differently would put her on notice that she was violating his constitutional rights. Thank you very much. All right. Thank you, Mr. Charles. Mr. Richardson, you've got your rebuttal. Thank you very much, Your Honors. From what I gleaned a little bit from the questions from the panel, both myself and to the city, there are unlimited questions of fact that are pervasive through every element of these offenses. Our – This is Judge Sutton. Let me ask you a related line of questioning, but it hasn't come up in the briefs, but it is something that's giving me pause. We know that the case law and holdings that are out there are distinguishable because those are cases in which the officers, the state or city specifically identified, you know, sometimes even with addresses, I think Kallstrom, he's confidential informant, and what's going on in your case and your argument is there's a bunch of facts and circumstances that make it pretty easy from your perspective to infer who was the confidential informant, and I think your basic theory is why shouldn't those cases be decided the same way as Kallstrom and Nelson where confidential informant is specifically named. What bothers me about this position is, as you must know in the criminal justice system, confidential informants are not the only people that cooperate with the government. In fact, the Article 3 of the federal courts just did a big study on cooperators, which would pick up everybody, confidential informants included, and what happens to them in prison? There's a website called Who's a Rat, and the gist of the investigation was they found lots of assaults, including some murders, that grew out of inmates finding out that other people were, quote, cooperators, rats, whatever you want to say. Now, all of those situations were ones where it's the same type of deal. They were able to look at a 5K safety valve departure. They were able to say, aha, why else would you get a 5K but the fact you cooperated with the government, you therefore must be a cooperator, therefore we're going to assault you because we don't like cooperators. And what I'm just terribly nervous about with your position is that it's not just going to apply to confidential informants. It's going to apply to all these prison assaults where it's the same deal. It will be a facts and circumstances test. Did the government, the court, convey too much at sentencing? And, of course, we have these competing needs to have some information in the public record about this, and I just don't know where your position ends. But I can tell you there's a lot of assaults in prisons against cooperators, and I'm going to suspect a lot of those individuals or their families would have a similar claim if you prevail today or at least are entitled to go to a jury. So how do you respond to that? My belief, Your Honor, is that it all relates back to the degree or the level of risk you agree to undertake. When you are a cooperator, your cooperation is going to be documented and it's going to be included in a plea agreement, and you have assumed that level of risk to get to consideration. But you're also often told it's going to be confidential. Pardon me, sir? You're often told it will be kept confidential. I can only address kind of an extrapolation type question. I can only respond, I guess, with my personal experiences, but in federal cases, which these were not federal cases, but that 5K credit is in the plea agreement. And I'm sorry, but I can't address what representations are made to those defendants in terms of confidentiality, but I do know, and the district court specifically found in their decision, that Tom Schivitz had no conditions attached to his acting as an informant other than to give Carrie Williams a person she could buy drugs from. That was it. If this worked out, wasn't he eventually either going to have charges dropped or when charges were brought against him, he'd get a reduced sentence? Wouldn't he be in the same position as a cooperator? I don't believe so, because if you believe the city, Carrie Williams, Detective Carrie Williams, did not have that authority. What would ultimately have transpired, regrettably, we'll never know. But I believe we have to focus on the level of risk that the state's affirmative action created when it occurred. I'm just making the point that I think you're right, that if working as a confidential informant means you're never charged at all, yes, there is a good chance there's nothing, there's no way to figure you out other than the kind of speculation, inference drawing that, well, how else did the officers know to arrest me? But quite often it's going to happen that being a confidential informant just means you're going to be charged with less, and then you're back into classic cooperator mode and sentencing, and you start allowing the same inferences and the same risks. What I may say in response to that is the lack of any informant agreement in the city of Toledo may be somewhat at the heart of this issue because it's loose. Tap a guy on the shoulder in the jail. We have some clarity in Sumar and even in Nelson because those police departments present an informant with an agreement that gives him some description of his obligations. The city of Toledo doesn't have any such agreement, and frankly it's reflected and it is consistent with how carelessly and how recklessly they made this by-pass. Okay, Judge Gilman and Judge Sirheinrich, do you have any other questions? No, nothing else here. All right, I think we're good. Thank you, Mr. Richardson. Thank you, Mr. Charles, for making yourselves available. We appreciate it, and the case will be submitted.